**HILARIO, Appellant,**

v.

**TAFT, STETTINIUS & HOLLISTER, L.L.P., et al., Appellees.**

[Cite as *Hilario v. Taft, Stettinius & Hollister, L.L.P.*,
194 Ohio App.3d 157, 2011-Ohio-1742.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 95262.

Decided April 7, 2011.

158

Koblentz & Penvose, L.L.C., Richard S. Koblentz, and Bryan L. Penvose, for appellant.

Hahn, Loeser & Parks, L.L.P., Robert J. Fogarty, and Joni Todd, for appellees.

JAMES J. SWEENEY, Judge.

{¶ 1} Plaintiff-appellant, Nene Hilario, appeals from the order of the trial court that awarded summary judgment to defendants-appellees, Taft, Stettinius & Hollister, L.L.P. ("Taft"), and attorney Peter Poulos (collectively referred to as "defendants"), in Hilario's action for legal malpractice in connection with the preparation of a "Personal Services Agreement" ("PSA") that required Hilario to pay Joseph Santos, Hilario's former interpreter, personal assistant, and manager, six percent of Hilario's "annual worldwide gross revenue" for seven years. For the reasons set forth below, we reverse and remand for further proceedings.

{¶ 2} The record reveals that on February 1, 2007, Hilario, a Brazilian-born professional basketball player who currently plays for the National Basketball Association's ("NBA") Denver Nuggets, filed a complaint against defendants and Santos. Hilario asserted claims for legal malpractice, fraud, and negligent misrepresentation. He then voluntarily dismissed the original action without prejudice on March 29, 2007, during the pendency of an action for breach of contract that Santos filed against Hilario in Colorado. Thereafter, on March 28, 2008, after the Colorado proceedings terminated in Hilario's favor,[1] he then refiled the instant matter.

{¶ 3} Hilario alleged that after the defendants had represented him in a previous matter, Santos contacted Poulos about drafting a contract between Santos and Hilario and met with him outside Hilario's presence and knowledge. Hilario further alleged that Santos had multiple private communications with Poulos.

---

1. On November 16, 2007, an arbitrator in Colorado concluded that the PSA was unenforceable because Santos had exercised undue influence in having Hilario sign this document, the PSA was unconscionable, there was no evidence that Hilario truly understood it after having read it, and he did not consent to its terms. Moreover, the arbitrator concluded that Poulos did not act as Hilario's attorney for this transaction.

{¶ 4} According to Hilario, on May 4, 2005, Santos sent Poulos an e-mail in which he stated that he needed the contract to "cover [his] ass in case of any future problems." Santos's e-mail stated as follows:

Peter,

Hope this email finds you well. Nuggets suck!

Before going into the details of the contract I want to talk about a couple of points to remember. Nene and I want this contract to be fairly simple and straight forward—as short as possible. Having said that, *I need the contract to cover my ass in case of any future problems.*

Here are the details of the contract.

1. Duration: 7 years beginning November 15, 2005–November 14, 2012.

2. Personal Services—eventually this contract will turn into my salary as CEO of Nene31 Inc.

3. Duties: Handle or at least be aware of all Nene's business affairs—Bills, Investments, Insurance Policies, Analyze Marketing Opps, Administer Charitable Contributions, Media Opps.

4. Compensation: *6% of NBA Basketball Salary*

5. Expenses: Nene will cover all reasonable expenses involving Office space/supplies/bills, Nene31 Inc. Travel / hotel business related.

Do we need a termination clause?

*NeNe* [sic] *didn't want this designated as a contract per se, more as guide-lines.* When we meet with everyone in Cleveland to go over all his stuff it was going to be presented. I thought that way it could be official. *He will sign the contract if he has to* [,] *but I know he feels that his verbal commitment will suffice.*

(Emphasis added.)

{¶ 5} Poulos subsequently drafted a waiver of conflict of interest to be signed by Hilario and Santos and prepared an identical draft of the document in Portuguese, Hilario's native language. This document stated:

*As we have discussed, I will be representing both you and Joe Santos as parties to the Personal Services Agreement (the "Agreement") signed July 28, 2005.* You hereby acknowledge that both parties agreed to the terms of the Agreement without my involvement[,] and my representation is limited to putting the agreed terms in writing.

By signing this letter, you agree to waive any conflict of interest that may exist by virtue of my representation of both you and Joe Santos as parties to the Agreement.

(Emphasis added.)

{¶ 6} Poulos then prepared English and Portuguese versions of the PSA for Santos and Hilario to sign. The PSA stated that as "compensation for Santos' services, as set forth in this agreement, Hilario agrees to pay Santos six percent (6%) of his annual worldwide gross revenue" for seven years.

{¶ 7} Hilario alleged that in the meeting at Taft on July 28, 2005, Santos served as his translator during the execution of the documents and that he did not have a meaningful conversation with Poulos regarding the terms of the documents. Hilario also alleged that defendants purported to represent both Hilario and Santos as stated in the first sentence of the waiver, that he was never advised to obtain independent counsel, and that the conflict of interest is nonwaivable.

{¶ 8} Hilario further alleged that Poulos never discussed the terms of the PSA with him and that Santos, the translator for the meeting, represented that Hilario's NBA income and other funds that Santos had no responsibility for generating would not be included within the PSA. Finally, Hilario alleged that he did not fully understand the terms of the documents and that he did not provide informed consent to their provisions.

{¶ 9} Poulos acknowledged that he had previously represented Hilario in an unrelated dispute with his Brazilian team. Poulos also admitted that he had discussed the PSA with Santos, apart from Hilario, "a number of times" from April to July 2005 and had a meeting with Santos on or about June 20, 2005. Poulos asserted, however, that he provided limited representation "in connection with documenting in writing the terms of the [PSA] upon which said terms Plaintiff and Santos had previously independently agreed." Poulos also admitted that Hilario was not advised to consult with other counsel prior to executing the PSA, but he maintained that he consulted with him and reasonably believed that Hilario understood the terms of the PSA as well as the July 28, 2005 conflict-of-interest letter.

{¶ 10} On September 9, 2009, defendants moved for summary judgment, asserting that the action as originally filed in February 2007 was barred by the statute of limitations. Defendants asserted that the matter was not filed within one year of (1) the July 28, 2005 termination of the attorney-client relationship with Poulos, or, in the alternative, (2) the August 2005 conversation between Hilario and his employee in Brazil, Jose Xavier ("Xavier"), regarding the PSA.

{¶ 11} In opposition, Hilario asserted that following the execution of the PSA, Santos continued to maintain control over Hilario's finances and falsely repre-

sented that Hilario was in sound financial condition. Hilario averred that he did not learn of the terms of the PSA until the week of March 6, 2006, the point at which new counsel advised him about the agreement, in response to Santos's lawsuit that demanded six percent of Hilario's gross revenue.

{¶ 12} The trial court granted defendants' motion for summary judgment and concluded:

{¶ 13} "[T]he communication between plaintiff and [Jose Xavier] in August 2005 regarding the personal services agreement constituted a cognizable event, sufficient to put a reasonable person on notice that a questionable legal practice may have occurred. The court further finds that the attorney-client relationship for the particular transaction that serves as the basis of this lawsuit terminated on July 28, 2005, the day the Personal Services Agreement was signed."

{¶ 14} Hilario now appeals and assigns the following interrelated errors for our review:

1. The trial court erred by not requiring Appellees–Defendants to meet the burden assigned to the moving party on a motion for summary judgment.

2. The trial court erred by granting summary judgment in favor of the Appellees–Defendants and ruling that Appellant's claim of legal malpractice is barred by the applicable statute of limitations.

3. The trial court erred by granting summary judgment in favor of the Appellees–Defendants based upon a finding that a "cognizable event" occurred at the latest sometime in August, 2005, thereby triggering the statute of limitations and barring Appellant's claim for malpractice.

4. The trial court erred by granting summary judgment in favor of the Appellees–Defendants based upon a finding that the "attorney-client relationship" for this transaction terminated on July 28, 2005, thereby triggering the statute of limitations and barring Appellant's claim for malpractice.

{¶ 15} For the sake of clarity, we shall address the errors out of their predesignated order and combine them when appropriate to do so.

## Introduction

{¶ 16} With regard to procedure, we note that appellate review of a trial court's grant of summary judgment is de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. Civ.R. 56(C) provides that before summary judgment may be granted, a court must determine the following:

(1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and

viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party.

{¶ 17} The moving party carries the initial burden of providing specific facts that demonstrate its entitlement to summary judgment. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264. If the movant fails to meet this burden, summary judgment is not appropriate. Id. On the other hand, if the movant does meet this burden, summary judgment is appropriate only if the nonmovant fails to establish the existence of a genuine issue of material fact. Id.

{¶ 18} With regard to the substantive law, we note that R.C. 2305.11(A) sets forth the limitations period in this case and provides that "[a]n action * * * for malpractice * * * shall be commenced within one year after the cause of action accrued * * *." This period begins to accrue on the happening of a "cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney or when the attorney-client relationship for that particular transaction or undertaking terminates, whichever occurs later." *Zimmie v. Calfee, Halter & Griswold* (1989), 43 Ohio St.3d 54, 538 N.E.2d 398, at syllabus (*Zimmie II* ).

### Cognizable Event

{¶ 19} For Hilario's third assignment of error, he argues that the trial court erred by granting summary judgment to defendants based upon a finding that the "cognizable event" occurred in August 2005, when Hilario's employee in Brazil, Xavier, telephoned Hilario in Denver, Colorado, and spoke with him about the terms of the PSA.

{¶ 20} A cognizable event is an event whereby the plaintiff discovered or should have discovered that he was injured by defendants' action and was put on notice of his need to pursue his possible remedies. Id. at 58, 538 N.E.2d 398. It is that date on which a noteworthy event occurred that does or should alert a reasonable person that a questionable legal practice may have occurred. Id.

{¶ 21} In this connection, the *Zimmie II* court further explained that the "discovery rule" applies to actions for legal malpractice, and the statute of limitations begins to run when the client discovers, or, in the exercise of reasonable care and diligence should have discovered, the resulting injury. Id., citing *Skidmore & Hall v. Rottman* (1983), 5 Ohio St.3d 210, 5 OBR 453, 450 N.E.2d 684, at syllabus. This approach requires an inquiry into the particular facts of the action. Id. In determining the cognizable event, the focus should be on what the client was aware of and not an extrinsic judicial determination. *Chinese Merchants Assn. v. Chin,* 159 Ohio App.3d 292, 2004-Ohio-6424, 823

N.E.2d 900, citing *Vagianos v. Halpern* (Dec. 14, 2000), Cuyahoga App. No. 76408, 2000 WL 1844752, and *McDade v. Spencer* (1991), 75 Ohio App.3d 639, 600 N.E.2d 371.

{¶ 22} In *Omni–Food & Fashion, Inc. v. Smith* (1988), 38 Ohio St.3d 385, 528 N.E.2d 941, at paragraph two of the syllabus, the Supreme Court of Ohio further explained:

> For the purposes of determining the accrual date of R.C. 2305.11(A) in a legal malpractice action, the trial court must explore the particular facts of the action and make the following determinations: when the injured party became aware, or should have become aware, of the extent and seriousness of his or her alleged legal problem; whether the injured party was aware, or should have been aware, that the damage or injury alleged was related to a specific legal transaction or undertaking previously rendered him or her; and whether such damage or injury would put a reasonable person on notice of the need for further inquiry as to the cause of such damage or injury.

{¶ 23} In *Zimmie II*, 43 Ohio St.3d 54, 538 N.E.2d 398, the Supreme Court held that a cognizable event is an event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney.

{¶ 24} In *Zimmie*, as in this matter, the court was asked to determine the accrual date of the client's claim for malpractice in connection with the drafting of a document, in that case, an antenuptial agreement that did not contain a required schedule of assets. William Zimmie's attorney prepared the antenuptial agreement and mailed copies of it to William and his fiancée, Kathryn, on May 28, 1963. The agreement referred to schedules of assets that Kathryn and William were to exchange, but the schedules were never prepared. William and Kathryn signed the antenuptial agreement prior to their wedding, and William delivered the signed agreement to his attorney on the morning of the wedding. No further action was ever taken, and no schedule of assets was prepared. In December 1977, Kathryn filed for divorce. See generally *Zimmie II*; see also *Zimmie v. Calfee, Halter & Griswold* (Dec. 10, 1987), Cuyahoga App. No. 52353, 1987 WL 27568 (*Zimmie I*). At this time, the attorney who had drafted the antenuptial agreement "concluded that it would be better if an attorney outside its firm represented [William] in the divorce." *Zimmie II*, 43 Ohio St.3d at 55, 538 N.E.2d 398.

{¶ 25} The divorce proceeding was bifurcated so as to first determine whether the antenuptial agreement was valid. On October 13, 1981, the trial court invalidated the antenuptial agreement. The trial court concluded that neither party was bound by the agreement's terms and provisions since William had not

fully disclosed his financial assets to Kathryn and, therefore, she did not have full knowledge of his financial situation and did not voluntarily execute it. See *Zimmie II.* On February 3, 1983, this court affirmed this ruling, and on June 13, 1984, the Supreme Court also affirmed.

{¶ 26} On June 7, 1985, William filed a legal-malpractice action against his attorney and the attorney's firm. The defendants filed a motion for summary judgment, asserting that the action was not filed within the statute of limitations. In opposition, William asserted that the action was filed within one year of June 13, 1984, the date the Ohio Supreme Court determined that the antenuptial agreement was invalid. *Zimmie I.*

{¶ 27} The trial court concluded that the malpractice action accrued on October 13, 1981, the date on which the domestic-relations court invalidated the antenuptial agreement. This court affirmed. *Zimmie I.* The Ohio Supreme Court also affirmed, and stated:

> In this case, we find that the cognizable event whereby Zimmie [William] discovered or should have discovered that he was injured by appellees' action and was put on notice of his need to pursue his possible remedies against appellees was on October 13, 1981[,] when the trial court invalidated the antenuptial agreement. At that time, Zimmie [William] should have realized that the property he brought into his marriage would not be protected from his wife Kathryn in the divorce proceeding, *i.e.,* his monetary exposure in the divorce would be greater since the antenuptial agreement was invalid. When the trial court held that the antenuptial agreement was invalid, Zimmie [William] was put on notice of his need to pursue further remedies against appellees, who had drafted the agreement.

*Zimmie II,* 43 Ohio St.3d at 58, 538 N.E.2d 398.

{¶ 28} Significantly, in establishing the 1981 accrual date, the courts did not look to the 1963 delivery of the incomplete antenuptial agreement. The courts also did not look to Kathryn's December 1977 complaint for divorce that challenged the antenuptial agreement, or the 1977 refusal of the attorney who had drafted the antenuptial agreement to represent William in the divorce because of the faulty antenuptial agreement. Rather, the court concluded that the cognizable event was the trial court's October 13, 1981 invalidation of the antenuptial agreement, because this was when William discovered or should have discovered that he was injured by defendant's action and was put on notice of his need to pursue his possible remedies against them. Thus, although the validity of the antenuptial agreement was clearly in dispute during the four-year period from the filing of the complaint to the trial court's decision on this matter, it is the trial court's decision that establishes the point at which the claim for relief

accrued, as this is the date on which William was "appreciably and actually damaged."

{¶ 29} Similarly, this court held in *Vagianos v. Halpern*, Cuyahoga App. No. 76408, 2000 WL 1844752, that the possibility or remote chance that malpractice occurred does not constitute a cognizable event. This court stated:

> [T]he mere assertion of a defense does not establish that the defense has any merit, much less that counsel's substandard representation is responsible for the availability of the defense. If the defense were ultimately rejected, there surely would be no reason to treat its mere assertion as a cognizable event. To rule otherwise would result in a flood of unnecessary complaints filed by clients who, in order to preserve their right to file, felt compelled to sue their former attorneys every time an affirmative defense suggested the possibility of malpractice. *A possibility or remote chance is not equivalent to a cognizable event.*

(Emphasis added.) Id. at *2.

{¶ 30} Therefore, when there is the "possibility or remote chance" that there has been malpractice, an "actual adverse ruling" may constitute the cognizable event that causes the claim for relief to accrue. *Vagianos*, citing *Cutcher v. Chapman* (1991), 72 Ohio App.3d 265, 594 N.E.2d 640 (cognizable event when trial granted summary judgment on statute-of-limitations grounds); *Lowe v. Cassidy* (Nov. 3, 1994), Franklin App. No. 94APE06–784, 1994 WL 612376 (cognizable event when jury returned an adverse jury verdict).

{¶ 31} This court reached a similar result in *Wozniak v. Tonidandel* (Oct. 1, 1998), Cuyahoga App. No. 73086, 1998 WL 685497, in which this court determined that in plaintiff's action against defendant for malpractice in connection with the representation of plaintiff in a probate action for concealment of assets and other claims, the cognizable event occurred upon the jury's adverse determination that plaintiff had concealed and embezzled probate assets.

{¶ 32} Likewise, in *Wisecup v. Gulf Dev.* (1989), 56 Ohio App.3d 162, 565 N.E.2d 865, the court held that even though a plaintiff knew that his employer had over-reported his income to the IRS, the statute of limitations on the plaintiff's claim against his employer did not begin to run until the IRS decided not to redetermine the income tax, because that is when the plaintiff's cause of action accrued. Id. at 165.

{¶ 33} This rule is not applied, however, when the record demonstrates that the plaintiff discovered or should have discovered that his injury was related to his attorney's act or omission and the client is put on notice of the need to pursue possible remedies against the attorney. *Szabo v. Goetsch*, Cuyahoga App. No. 88125, 2007-Ohio-1147, 2007 WL 764544. In that case, this court held that the

cognizable event occurred when the plaintiff attended oral argument in the court of appeals and learned that the failure of plaintiff's counsel to serve and/or attach a certificate of service to his responsive pleadings might subject those pleadings to being stricken. Accord *McDade,* 75 Ohio App.3d 639, 600 N.E.2d 371 (where plaintiff's malpractice claim was based upon attorney's alleged unauthorized settlement of divorce, cognizable event occurred when the plaintiff was cited for contempt of court for failing to comply with the terms of the settlement agreement, and not upon the conclusion of the contempt proceedings); *Burzynski ex rel. Estate of Halevan v. Bradley & Farris Co., L.P.A.* (Dec. 31, 2001), Franklin App. No. 01AP–782, 2001 WL 1662042 (where plaintiff was aware that his claims would be time-barred if not filed by the end of January 1998, cognizable event occurred on July 10, 1998, when opposing party asserted statute-of-limitations defense).

{¶ 34} In this matter, the trial court concluded that the August 2005 telephone call to Hilario from his employee, Xavier, regarding the PSA constituted the cognizable event, sufficient to put a reasonable person on notice that a questionable legal practice may have occurred.

{¶ 35} Defendants assert that the cognizable event occurred on July 28, 2005, the date on which Hilario and Santos flew to Cleveland from Denver, Colorado, solely for the 45–minute meeting with Poulos and his associate Julie Crocker, in which Hilario received Portuguese translations of three pieces of paper. That is, defendants assert that the documents themselves were sufficient to put Hilario on notice that he had agreed to pay Santos six percent of his worldwide gross income, that defendants were undertaking joint representation, and that he was waiving any conflict of interest. Alternatively, they assert that Hilario's August 2005 discussion with Xavier constituted the cognizable event, sufficient to put a reasonable person on notice that a questionable legal practice may have occurred.

{¶ 36} Hilario maintains that there are genuine issues of material fact that preclude application of the statute of limitations as a defense. Hilario asserts that he reasonably relied upon defendants, who were his longtime and trusted attorneys, and reasonably relied upon their representations that they had acted properly in this undertaking. This reasonable reliance was not undermined by Hilario's subsequent discussion with Xavier, a Brazilian citizen with a high-school education, because Xavier was not one of Hilario's advisors and he had no special expertise that would give him more credibility than defendants. Therefore, this discussion was insufficient to put a reasonable person on notice that a questionable legal practice might have occurred. Moreover, Hilario maintains that the term "annual worldwide gross revenue" is, according to attorneys who have reviewed this matter, an ambiguous term, and therefore, it would not be

understood or clear to Hilario, who was 22, needed an interpreter, and had the equivalent of a high-school education.

{¶ 37} Beginning with defendants' claim that a cognizable event occurred on July 28, 2005, the date on which Hilario received and signed the documents, we note that the trial court rejected this as the date of the cognizable event. Further, we conclude, based upon the plain language of *Zimmie II*, 43 Ohio St.3d 54, 538 N.E.2d 398, that the documents themselves were insufficient to put Hilario on notice that he had agreed to pay Santos six percent of his worldwide gross revenue, that defendants were undertaking joint representation, and that he was waiving any conflict of interest. That is, in *Zimmie II*, the Ohio Supreme Court determined that the cognizable event that caused the cause of action to accrue was the October 13, 1981 ruling of the trial court that invalidated the antenuptial agreement.

{¶ 38} With particular significance to this matter, the courts did not designate as the cognizable event the 1963 delivery of the incomplete antenuptial agreement to William, Kathryn's December 1977 complaint for divorce that challenged the antenuptial agreement, or the 1977 refusal of the attorney who had drafted the antenuptial agreement to represent William in the divorce due to the faulty antenuptial. Rather, the court concluded that October 31, 1981, was the date on which William was "appreciably and actually damaged," *Zimmie II*, and the date of the cognizable event whereby he discovered or should have discovered that he was injured by defendant's action and was put on notice of his need to pursue his possible remedies against them. Therefore, the receipt of improperly drafted documents is insufficient to put the client on notice of his claim for relief. Rather, at this point, there is simply a "remote chance or possibility of malpractice."

{¶ 39} In addition, examining the record based upon "what the client was aware of,"[2] we note that although Hilario received the PSA and waiver-of-conflict letter on July 28, 2005, he had no knowledge of Poulos's prior private communications with Santos. Further, while he was informed that Santos needed the agreement for immigration purposes, he did not know that on May 4, 2005, Santos sent Poulos an e-mail in which he stated that he needed the contract to "cover [his] ass in case of any future problems," and additionally stated:

*NeNe* [sic] *didn't want this designated as a contract per se, more as guide- lines.* When we meet with everyone in Cleveland to go over all his stuff it was going to be presented. I thought that way it could be official. *He will sign the*

---

2. See *Chinese Merchants Assn.*, 159 Ohio App.3d 292, 2004-Ohio-6424, 823 N.E.2d 900.

*contract if he has to [,] but I know he feels that his verbal commitment will suffice.*

(Emphasis added.)

{¶ 40} These omissions, coupled with Hilario's language barrier and the use of Santos as Hilario's translator for this meeting rather than a disinterested interpreter, bar the July 2005 receipt of the documents as a cognizable event.

{¶ 41} Further, Hilario presented evidence that pursuant to DR 5–105(C), the waiver-of-conflict-of-interest letter provided to him was not appropriate and did not justify multiple representation of the parties for the following reasons: the conflict of interest was unwaivable given the parties' adverse interests, there was a lack of independent professional judgment, and there was a lack of full disclosure.  See also Prof. Cond.R. 1.7.

{¶ 42} Accordingly, we conclude that no cognizable event occurred on July 28, 2005, the date on which Hilario received and signed the documents at issue.

{¶ 43} Turning to the trial court's determination of the cognizable event, i.e., Xavier's discussion with Hilario about the PSA, following our de novo review of the record, we are compelled to conclude that the discussions with Xavier were insufficient to put Hilario on notice that his longtime and trusted counsel had improperly drafted the PSA or had failed to properly represent his interests.

{¶ 44} The record reveals that Xavier is a high-school graduate who lives in Brazil.  He has a military background and worked as a finance person for a Brazilian police department.  In 2004, Santos hired him to assist with Hilario's finances in Brazil.  During his employment, Xavier became concerned about Santos's wire transfers of Hilario's funds.  At this point, Xavier, who reported to Santos, knew Hilario only superficially and saw him only when Hilario was in Brazil.

{¶ 45} In August 2005, the record further indicates that in Brazil, Hilario's sister found a copy of the PSA in a drawer and asked Xavier to read it.  Xavier read the Portuguese translation of the PSA and concluded that it was "absurd." He then telephoned Hilario in Denver and told him about "the financial movements [Santos] had been doing in Brazil and the contract he [Hilario] had signed."

{¶ 46} Hilario indicated that he did not believe Xavier and that he was "completely wrong," because he would never have signed a contract with such terms, and that "had not been what [Santos] had said to him."  Following this discussion with Xavier, there is no evidence that Hilario had actual or constructive knowledge that he was injured by the drafting of the PSA.

{¶ 47} Approximately three months later, Xavier contacted Hilario again to inform him that Santos's expenses were increasing dramatically. In this discussion, Xavier again brought up the subject of the PSA. Xavier implored Hilario to hire someone trustworthy to audit Santos's expenditures. Then, two days before firing Santos, Hilario informed Xavier that Santos had not been complying with his orders, that he had signed the PSA out of trust in Santos, and that he had "never imagined those were the terms."

{¶ 48} From the foregoing, we conclude that the August 2005 discussion with Xavier was not a cognizable event that would have put a reasonable person on notice of a potential claim for malpractice in connection with the drafting of the PSA. Hilario knew Xavier only superficially at this point. In addition, Xavier's remarks regarding the PSA were completely unsolicited, following Hilario's sister's discovery of this document in a drawer. Further, Xavier had no legal expertise, and there is no reason why an unsolicited phone call from Brazil would have been of such gravity or credibility to counter what Hilario had already been told by Poulos and Santos, with whom he had been dealing since 2002. Rather, at this time, Hilario continued to reasonably rely upon defendants and their representations that they had acted properly in this undertaking, and he reasonably determined that Xavier was "completely wrong." Further, Hilario presented evidence that the phrase "annual worldwide gross revenue" is an ambiguous term, which may or may not be interpreted to include the NBA earnings. Therefore, we conclude that the August 2005 conversation was insufficient to put a reasonable person on notice that a questionable legal practice might have occurred.

{¶ 49} In accordance with the foregoing, we conclude that defendants failed to meet their burden of establishing that they are entitled to judgment as a matter of law. Defendants' evidentiary materials were insufficient to establish that Hilario's July 28, 2005 receipt of the conflict-of-interest letter and the PSA was sufficient to put Hilario on notice that he had agreed to pay Santos six percent of his worldwide gross income, that defendants were undertaking joint representation, and that he was waiving any conflict of interest. Further, defendants' evidentiary materials were insufficient to establish as a matter of law that Hilario's August 2005 discussion with Xavier constituted the cognizable event sufficient to put a reasonable person on notice that a questionable legal practice might have occurred.

{¶ 50} Although defendants complain that Hilario's affidavit was executed as part of the Denver arbitration proceedings, whereas Poulos executed his affidavit as part of this matter, we note that *both* parties filed materials from the Denver proceedings in support of their positions below. Defendants did not object to Hilario's affidavit at the trial level and did not move to strike this

document from the record below. Defendants have therefore waived any error associated with the trial court's consideration of this evidence. *Darner v. Richard E. Jacobs Group,* Cuyahoga App. No. 89611, 2008-Ohio-959, 2008 WL 607456, citing *Foster v. Cleveland Clinic Found.,* Cuyahoga App. Nos. 84156 and 84169, 2004-Ohio-6863, 2004 WL 2914985. See also *Green v. B.F. Goodrich Co.* (1993), 85 Ohio App.3d 223, 228, 619 N.E.2d 497; *Brown v. Ohio Cas. Ins. Co.* (1978), 63 Ohio App.2d 87, 90–91, 17 O.O.3d 267, 409 N.E.2d 253.

{¶ 51} Further, Hilario's affidavit was under oath, contained averments made on the basis of personal knowledge, was notarized, and bears the seal of the state of Colorado. It was therefore a self-authenticating document. Evid.R. 902.

{¶ 52} In addition, Hilario presented the affidavits of Kerry Garvis Wright and Frank Schuchat, which were prepared in connection with this matter.

{¶ 53} Kerry Garvis Wright averred:

4. Our law firm was retained by Nene Hilario in or about the first week of March 2006 to advise him on how to respond to demands for money asserted by his former manager, Joseph Santos, based on a Personal Services Agreement ("PSA") drafted by Peter Poulos.

5. Working with my law partner Patty Glaser, I helped to draft a March 7, 2006 letter signed by Ms. Glaser responding to Santos' demands and rejecting his claims for compensation under the PSA because Santos' termination was for cause and because we had questions about the enforceability of the PSA. * * *

6. When counsel for Santos first threatened legal action based on the PSA in March 2006, we commenced an investigation of all potential defenses, including an attack on the enforceability of the PSA, and we began gathering information about the facts and circumstances of the legal representation of Nene by Poulos and the Taft firm.

{¶ 54} Similarly, the affidavit of Frank Schuchat provides:

3. I was contacted by Daniel Nieves on or about March 2, 2006. Mr. Nieves had been asked by Nene to assist to normalize his financial affairs following the dismissal of Joe Santos. Mr. Nieves asked me to advise Nene with respect to various legal matters arising in the transition.

4. During the week after I was retained by Nene, Joe Santos made a demand for compensation under the Personal Services Agreement ("PSA"), and this demand was rejected in correspondence for co-counsel for Nene, Patty Glaser.

{¶ 55} Therefore, defendants are not entitled to summary judgment based upon the claimed deficiency in Hilario's evidentiary materials.

{¶ 56} The first and second assignments of error are well taken.

{¶ 57} Finally, looking to the accrual dates suggested by Hilario, including his February 28, 2006 dismissal of Santos and his meeting with new counsel in Los Angeles in the first week of March 2006, we conclude that it was the latter of these dates on which Hilario was actually and appreciably damaged, that he discovered or should have discovered that he was injured by defendants' actions, and that he was on notice of his need to pursue his possible remedies. The record contains evidence that the termination of Santos, though noteworthy, resulted from Hilario's receipt of confirmation about Santos's improper and surreptitious use of Hilario's funds. The evidence of record does not directly link the termination to Santos's claim of entitlement to funds under an expansive reading of the PSA.

{¶ 58} In the first week of March 2006, however, Hilario's new counsel had reviewed the PSA and opined that it was ambiguous, that Santos's claim for six percent compensation from all income whatsoever is "grossly overreaching and unreasonable," and that the entire agreement was unenforceable. Therefore, we conclude that Hilario's claim for relief accrued as of this date.

{¶ 59} In accordance with the foregoing, the trial court erred in concluding that this claim for relief accrued in August 2005. Rather, we conclude that the claim for relief accrued following Hilario's meeting with his new attorneys in the first week of March 2006, following Santos's demands for compensation under the PSA, which addressed the enforceability of the PSA. The third assignment of error is well taken.

### Termination of the Attorney–Client Relationship

{¶ 60} Within the fourth assignment of error, Hilario asserts that the trial court erroneously determined that the "attorney-client relationship" for this transaction terminated on July 28, 2005.

{¶ 61} As to the issue of the termination of the attorney-client relationship, the *Zimmie II* court held that termination is determined with regard to the "particular transaction or undertaking." Id., 43 Ohio St.3d at 54, 538 N.E.2d 398, applying *Omni–Food & Fashion, Inc. v. Smith* (1988), 38 Ohio St.3d 385, 528 N.E.2d 941.

{¶ 62} In this matter, Poulos deposed that the firm did no further work for Hilario following the execution of the July 28, 2005 PSA. In opposition, Hilario cites the November 6, 2006 correspondence in connection with the arbitration matter, which indicates that defendant performed services for Hilario at three different periods: "through April 30, 2005," "through July 31, 2005," and "through August 31, 2005." This document indicates, however, that "the Invoices

cover more than the Agreement [and] includes work related to Brazil sports operations."

{¶ 63} Considering all this evidence, the attorney-client relationship with regard to this particular matter terminated, at the latest, on August 31, 2005. Hilario's fourth assignment of error is therefore without merit, but because the accrual date is determined by the *later* of either the termination of the attorney-client relationship or the happening of a "cognizable event," *Zimmie II*, this does not alter our conclusion that this matter was timely filed since the original complaint was filed within one year of the cognizable event, Hilario's meeting with new counsel in the first week of March 2006.

{¶ 64} By application of *Zimmie II*, and as a matter of law, Hilario's claim for relief did not accrue upon his receipt of the PSA and waiver-of-conflict letter. Further, Xavier's telephone call from Brazil to Hilario in Denver, Colorado, following his unsolicited review and comments upon the PSA, was insufficient as a matter of law to trigger accrual of the malpractice claim because there was no basis for finding Xavier's advice to be more credible than the advice given by defendants, and Hilario had not been appreciably and actually damaged at that point. *Zimmie II*, 43 Ohio St.3d 54, 538 N.E.2d 398. Moreover, Hilario established, as a matter of law, that his claim for relief accrued in the first week of March 2006, when he received advice about the PSA from his new counsel in response to Santos's demands for compensation under the PSA. The trial court therefore erred in concluding that this matter is barred by the statute of limitations. The judgment of the trial court is reversed, and the matter is remanded for further proceedings.

Judgment reversed
and cause remanded.

KILBANE, A.J., and BLACKMON, J., concur.